IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CARL KNAUS, et al.,<br><br>                    Plaintiffs,<br><br>        v.<br><br>THE BOEING COMPANY, a corporation,<br><br>                    Defendant. | No. _____<br><br>Removed from<br>Circuit Court of Cook County,<br>County Department, Law Division<br>No. 2014 L 000541 |

## NOTICE OF REMOVAL

The Boeing Company ("Boeing") hereby removes this civil case currently pending in the Circuit Court of Cook County, Illinois, Law Division, Case No. 2014L000541.  Removal is timely, as Boeing was served with the complaint on January 24, 2014, and this removal notice is being filed within the 30-day period under 28 U.S.C. § 1446.  The case arises from the crash of a trans-oceanic commercial flight into a seawall on San Francisco Bay.  Accordingly, this Court has admiralty jurisdiction over this matter under 28 U.S.C. § 1333(1).  *See In re Air Crash at Belle Harbor, New York on Nov. 12, 2001*, MDL 1448 (RWS), 2006 WL 1288298 (S.D.N.Y. May 9, 2006).  In addition, the complaint has allegations directed at the conclusions and conduct of Boeing and its employees exercising federal regulatory authority formally delegated to them by the Federal Aviation Administration ("FAA").  Accordingly, this Court has federal officer jurisdiction under 28 U.S.C. § 1442(a)(1).  Because this Court has original jurisdiction as a matter of admiralty jurisdiction, federal officer jurisdiction, or both, removal is proper under 28 U.S.C. § 1441(a).

## INTRODUCTION

This lawsuit involving 80 plaintiffs arises from the crash on July 6, 2013 at San Francisco International Airport ("SFO") of a Boeing 777-200ER aircraft operated by Asiana Airlines ("Asiana"). The flight originated in Seoul, South Korea and traveled over the Pacific Ocean to the United States. The complaint alleges that, while over San Francisco Bay on its approach for landing, "the aircraft began to fly too slowly and descended below the safe approach path, and the flight crew was unable to restore a safe airspeed before the airplane crashed into a seawall adjacent to the runway." Ex. A: Complaint ¶ 1. There were 291 passengers and 16 crew members aboard. There were three fatalities and numerous injuries.

Of the 32 lawsuits that have been initiated as a result of this accident, 22 lawsuits have been filed against Asiana and Boeing in the Northern District of California, where the accident occurred. One lawsuit has been filed in the Superior Court of San Francisco County against the City and County of San Francisco, San Francisco International Airport, Asiana, and Boeing. Eight other lawsuits were filed against Boeing in the Circuit Court for Cook County, and removed by Boeing to this Court. On December 13, 2013, the Judicial Panel on Multidistrict Litigation ("JPML") concluded that those cases should be transferred to the Northern District of California. On December 16, 2013, however, Judge Leinenweber entered a remand order for the eight cases removed to this Court, though later it was clarified that the remand could not apply to the case in which the JPML's transfer order had already become effective in the Northern District of California. Boeing's motion for reconsideration of the remand order based on newly available evidence is currently pending and will be fully briefed by both sides.

This case is properly removed and should eventually be consolidated with the cases in the Northern District of California. This Court has jurisdiction over this matter arising in admiralty (28 U.S.C. § 1333(1)) and as a case challenging the conduct of Boeing and its employees exercising federal regulatory authority (28 U.S.C. § 1442(a)(1)).

Admiralty jurisdiction applies. A trans-oceanic flight is considered traditional maritime activity, and the critical events leading up to the accident all occurred over San Francisco Bay.

Judge Leinenweber remanded earlier cases (pending reconsideration) on an assumption that the accident did not become "inevitable" when the aircraft was entirely over navigable water. That assumption is clearly incorrect. Based upon the evidence released by the National Transportation Safety Board on December 11, 2013 and February 4, 2014—after the remand briefing in the earlier cases was complete—the accident became inevitable when the aircraft was entirely over San Francisco Bay. Admiralty jurisdiction exists, and based upon the 2011 amendments to 28 U.S.C. § 1441(b), admiralty cases may be removed like federal question cases. *See Ryan v. Hercules Offshore, Inc.*, 945 F. Supp. 2d. 772, 777-78 (S.D. Tex. 2013).

Boeing also removes this case under 28 U.S.C. § 1442(a) because the complaint challenges the conduct and conclusions of Boeing and its employees who serve as delegated representatives of the FAA during the certification process. The complaint alleges that the aircraft was "defective, not airworthy and/or not crash-worthy as a result of Boeing's defective design, manufacture, distribution, testing, maintenance, service and/or inspection of the subject aircraft." Ex A: Complaint ¶ 100. The complaint is challenging the inspections, reviews, and conclusions of Boeing employees exercising delegated FAA authority regarding the safety and effectiveness of aircraft systems, alerts, and warnings, and Boeing itself exercised delegated FAA authority with respect to the certification of this aircraft. Federal officer removal under 28 U.S.C. § 1442(a) applies, as courts have concluded regarding similar allegations in other cases. *See*, *e.g.*, *Scrogin v. Rolls-Royce Corp.*, No. 3:10CV442 WWE, 2010 WL 3547706 (D. Conn. Aug. 16, 2010); *AIG Europe (UK) Ltd. v. McDonnell Douglas Corp.*, No. CV 02-8703-GAF, 2003 WL 257702 (C.D. Cal. Jan. 28, 2003). The United States has taken the position before the U.S. Supreme Court that the FAA's delegated representatives act as federal officers.

Accordingly, this case is properly removed. Ultimately, it should be consolidated with actions in the Northern District of California.

## BACKGROUND

A.   **The accident.**

LEGAL29229616.1

On July 6, 2013, Asiana Flight 214 took off from South Korea for an eleven-hour flight to San Francisco, nearly all of which took place over the Pacific Ocean. By 11:00 a.m. PDT, the aircraft was nearing SFO and on a seventeen-mile, straight-in visual approach over San Francisco Bay. The map below from the NTSB shows the flight path. Ex. B: Declaration of Michelle Bernson ¶ 6.



At 11:21 a.m., having just turned over San Francisco Bay, the pilots were cleared for the visual approach. At 11:27 a.m., the aircraft struck the seawall at the south end of SFO airport and a significant piece of the tail of the aircraft fell into the water. *Id.* ¶¶ 7, 9, 11. In the aftermath of the accident, all of SFO's runways were shut down for about four hours. *Id.* ¶ 11. Dozens of flights were diverted to other airports, including at least three international flights. Numerous other flights were delayed or cancelled. *Id.* ¶ 9.

The NTSB held an Investigative Hearing regarding the Asiana accident on December 11, 2013. The day of the hearing, the NTSB publicly released nearly 4,500 pages of information about the accident through its "public docket."[1] The release included two reports detailing

---

[1] The docket for Asiana Flight 214, NTSB Accident ID DCA13MA120, can be found at
http://dms.ntsb.gov/pubdms/search/hitlist.cfm?docketID=55433&CFID=159667&CFTOKEN=25729791

LEGAL29229616.1

information from the Flight Data Recorder ("FDR") and the Cockpit Voice Recorder ("CVR"), the airplane's "black boxes." Information from those reports makes clear the crash became inevitable before the aircraft hit the seawall.

About eight seconds before impact, the airspeed was 111 knots—26 knots slower than the correct approach speed—and the engines were at idle. The altitude was 95 feet, and the aircraft was entirely over San Francisco Bay. At about this time one of the pilots moved the engine thrust levers forward from the idle position to the full thrust position. The levers remained in the full thrust position for the remainder of the flight, but because engines require time to "spool up" to a higher thrust, the engines had not yet reached full thrust at the time of impact. Ex. C: Declaration of Mr. Paul Bolds-Moorehead ¶ 9.

About three seconds before impact, the Instructor Pilot said "oh # go around"—in other words, abort the landing. About two seconds before impact, and still over water, the airspeed was 104 knots and the altitude had dropped to 24 feet. Pulling with more than 80 pounds of combined force, the pilots pulled the control columns as far back as possible. The engines were at about 23 percent of full thrust, with thrust continuing to increase. The pilots' efforts to arrest their descent and avoid contact with the water or ground were unsuccessful. *Id.* ¶ 11.

Paul Bolds-Moorehead, an aeronautical engineer at Boeing who specializes in aircraft flight characteristics and performance, reviewed and analyzed the information from the black boxes released by the NTSB on December 11. *Id.* ¶¶ 1, 7-8. Mr. Bolds-Moorehead concluded that "during the final seconds before impact the crash was inevitable because the aircraft's airspeed was so slow and altitude was so low that there was nothing further the crew could do to prevent the aircraft from hitting the seawall." *Id.* ¶ 12. The pilots pushed the throttles to full power and pulled the control column all the way back in an attempt to arrest their descent, but in the final seconds, while the plane was still over water, the laws of aerodynamics and physics rendered their efforts futile—the aircraft was irrecoverable and was inevitably going to crash either into the water or into the seawall. *Id.* ¶¶ 11, 12.

This conclusion was confirmed on February 4, 2014, when the NTSB's Aircraft Performance Group released a study identifying the last point at which the airplane could have successfully executed a "go-around" instead of impacting the ground. The Performance Group performed its study using detailed simulations based on data from the accident airplane's Flight Data Recorder. Based on these simulations, the Performance Group concluded that the accident aircraft "had adequate performance capability to accomplish a go-around initiated no later than 11 to 12 seconds prior to ground impact (depending on technique), assuming a minimum aft fuselage clearance during the maneuver of 30 feet above ground level." Ex. D: Declaration of Bruce Campbell, Attachment A (Aircraft Performance Group Study Addendum) at 2, 10. Eleven seconds before impact, the accident airplane was hundreds of yards from the seawall.

None of the information from the FDR Group Report, the CVR Group Report, or the Performance Group Study was available to Judge Leinenweber when he decided the motions to remand in the earlier cases. Once considered, this evidence demonstrates the accident was inevitable when the aircraft was over water, and the standard for federal maritime jurisdiction established by Judge Leinenweber is met.

### B.  Certification of the 777 and the 777-200ER.

The accident aircraft was a Boeing 777-200ER. The 777 is a long-range, twin-aisle, twin-engine jet. The 777 was first certified by the FAA and entered commercial service in 1995. The 777-200 is a longer-range 777. It was also first produced and certified by the FAA in 1995. The accident aircraft was delivered to Asiana in 2006. Ex. B: Bernson Decl. ¶ 5.

For an airplane to fly in U.S. airspace, the FAA must issue three separate certificates. First is a Type Certificate, which signifies "that the basic design of the aircraft meets the minimum criteria specified in the safety regulations promulgated by the FAA." *United States v. S.A. Empresa de Viacao Aerea Rio Grandense*, 467 U.S. 797, 800 (1984); 14 C.F.R. §§ 21.11-.55. Second is a Production Certificate, which requires a manufacturer to prove "that it has established and can maintain a quality control system to assure that each aircraft will meet the design provisions of the type certificate." *S.A. Empresa*, 467 U.S. at 806; 14 C.F.R. §§ 12.131-

.150.  Third is an Airworthiness Certificate, "which denotes that the particular aircraft in question conforms to the type certificate and is in condition for safe operation." *S.A. Empresa*, 467 U.S. at 806; 14 C.F.R. §§ 21.171-.199.

In determining that the aircraft and the manufacturer satisfy the regulatory standards, the FAA authorizes employees of the manufacturers and the manufacturer itself to serve as delegated FAA representatives.  The NTSB has recently published a helpful, short history of delegated FAA authority and how "the FAA oversees designee activities and any authorized compliance finding made by a designee or delegated organization is, in effect, an FAA finding."[2]

For the 777, hundreds of Boeing employees, plus Boeing itself, have served as FAA delegates overseeing certification activities ranging from the original design to ongoing upgrades.  Those FAA delegates exercised FAA authority across a vast array of systems and components on the aircraft.  Ex. E: Declaration of Anngelique Bowen ¶ 3; Ex. F: Supplemental Declaration of Anngelique Bowen ¶ 4.

The Airplane Information Management System ("AIMS"), which includes the autothrottle function, is one of many airplane systems Boeing employees with delegated authority review for compliance with Federal Aviation Regulations.  To certify the safety of the AIMS hardware, Boeing sends the FAA a description of the certification project and Boeing's plan for demonstrating system safety.  Ex. E: Bowen Decl. ¶ 7.  The FAA approves the certification plan.  Boeing employees acting as FAA delegates then perform a safety analysis of AIMS, showing that the system complies with the requirements in 14 C.F.R. sections 25.1309(b), (c), and (d).  *Id.* ¶ 8.  The Boeing employees then recommend, pursuant to their delegated authority, that the FAA approve the safety analysis and find that the AIMS complies with the Federal Aviation Regulations.  Only then does the FAA approve the safety analysis and make a finding of compliance and airworthiness.  *Id.* ¶ 10.

Further, the FAA has also expressly delegated to Boeing certain types of authority relating to certification of aircraft through the Delegation Option Authorization ("DOA")

---

[2] *See* http://www.ntsb.gov/investigations/2013/boeing_787/docket_documents/787_docket_doc3.pdf.

LEGAL29229616.1

program.  Ex. F: Supp. Bowen Decl. ¶ 4.  The FAA authorizes Boeing to act as its representative in performing delegated functions, including type, production, and airworthiness certification functions.  In performing its obligations as a DOA authorization holder, Boeing agrees "to exercise the same care, diligence, judgment, and responsibility when performing the delegated functions as would be exercised by the FAA."  *Id.*  In 2009, the FAA's delegation program changed, but Boeing remains an FAA delegate.  *Id.* at ¶ 5.  Thus, at the time of the delivery of the aircraft in 2006, and afterward when software updates were issued for the autothrottle system at issue in the complaint, Boeing was an FAA delegate.  *Id.* at ¶¶ 9-15.

### C.     The complaint.

The complaint alleges that "the aircraft began to fly too slowly and descended below the safe approach path, and the flight crew was unable to restore a safe airspeed before the airplane crashed into a seawall adjacent to the runway."  Ex. A: Complaint ¶ 1.  The complaint alleges that "[t]he design of the auto-throttle controls systems, the auto-pilot controls systems, and/or the low airspeed warning systems on the subject aircraft, their improper installation, and/or their defects, resulted in dangerously inadequate warnings to pilots about low airspeed."  *Id.* ¶ 88.  As pleaded, the effects of those alleged defects would have occurred while the aircraft was over San Francisco Bay, leading to impact at the seawall.  Ex. B: Bernson Decl. ¶ 7.  The complaint alleges three causes of action—negligence, strict liability, and loss of consortium.

### D.     Litigation.

To date, 32 lawsuits have been filed arising from the crash and naming either Boeing or Asiana, or both, as defendants.  Of those 32 lawsuits, 22 were filed in the Northern District of California.  One lawsuit was filed in the Superior Court of San Francisco County.  The remaining nine lawsuits (including this one) were originally filed in the Circuit Court of Cook County, Illinois, against Boeing, and all nine have been removed to the Northern District of Illinois on the basis of federal admiralty jurisdiction and federal officer jurisdiction.  On September 24, 2013,

Boeing moved under 28 U.S.C. § 1407 to centralize the litigation arising from the Accident. *Lu, et al. v. The Boeing Co.* (N.D. Ill. Case No. 1:13-cv-07418) Dkt. 11.

On December 13, the Panel granted Boeing's transfer motion and established MDL proceedings in the Northern District of California for the accident litigation. *Lu* Dkt. 41. That same day the Panel's Transfer Order was filed in the Northern District of California. *Id*. Under 28 U.S.C. § 1407(c), the Transfer Order thereby became "effective" and thus established jurisdiction in that district over all cases subject to the order. The lead case was *Yang*, with tag-along cases to receive their own orders in due course.

The following Monday, December 16, however, Judge Leinenweber issued a ruling purporting to grant pending motions for remand in all eight of the Northern District of Illinois cases before him, including *Yang*. The next day, Judge Leinenweber vacated that order in *Yang*, recognizing that the order had been issued after he had "lost jurisdiction." *Lu* Dkt. 42. *See Gen. Elec. Co. v. Byrne*, 611 F.2d 670, 673 (7th Cir. 1979). Although the Transfer Order had acknowledged the other seven actions as "potential tag-along actions," Judge Leinenweber did not vacate his remand order for them.

Boeing sought a stay of the mailing of the remand order and moved for reconsideration. Boeing argued that reconsideration was necessary because information released by the NTSB after the original remand briefing was complete showed the "inevitability" test for federal maritime jurisdiction crafted by Judge Leinenweber was satisfied. Judge Leinenweber had ruled without the benefit of briefing or evidentiary submissions on the question of inevitability. The facts now available to the parties show that applying basic principles of physics, aerodynamics, and aircraft performance, this accident was inevitable while the airplane was wholly over water, thus satisfying Judge Leinenweber's legal standard for applying federal maritime jurisdiction. Judge Leinenweber had also misapprehended the facts and the law relating to federal officer jurisdiction. Remand was improper.

A stay was granted, and on January 7, 2014, Judge Leinenweber held a hearing and set a briefing schedule on Boeing's motion for reconsideration. Under that schedule, briefing will be completed by February 7, 2014. The stay of remand remains in effect until remand is resolved.

## ARGUMENT

**I.    This Court has admiralty jurisdiction, and removal is proper.**

The Constitution grants original jurisdiction to hear admiralty claims. *See* U.S. Const. art. III, § 2, cl. 1. That jurisdiction is codified at 28 U.S.C. § 1333(1). The test to determine if there is a basis for federal admiralty jurisdiction has three parts: (1) whether the activity giving rise to the incident has a substantial relationship to traditional maritime activity; (2) whether the tort occurred on navigable water or injury suffered on land was caused by a vessel on navigable water; and (3) whether the general features of the type of incident have a potentially disruptive impact on maritime commerce. *See Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 534 (1995). All three are met here.

As to the first part of the test, before air travel any trip from South Korea to America would have been by ship. The accident flight therefore has a substantial relationship to maritime activity, as other courts have held.[3]

As to the second "location" part of the test, in the context of aviation crashes the "location" element has been interpreted as asking whether "the 'whole wrongful agency was put in motion and took effect' over navigable water," not where "physical injury" happened to occur. *In re Air Crash at Belle Harbor, New York on Nov. 12, 2001*, MDL 1448 (RWS), 2006 WL 1288298, at *12 (S.D.N.Y. May 9, 2006) (quoting *The Strabo*, 98 F. 998, 100 (2d Cir. 1900)); *see also Brown v. Eurocopter, S.A.*, 38 F. Supp. 2d 515, 517 (S.D. Tex. 1999) (the wrong was "consummated" over navigable water because "the mechanical problems … originated and

---

[3] *See Miller v. United States*, 725 F.2d 1311, 1315 (11 Cir. 1984) (flight between Bahamas and Florida), cert. denied, 469 U.S. 821 (1984); *Williams v. United States*, 711 F.2d 893, 896 (9th Cir. 1983) (flight from California to Hawaii); *Roberts v. United States*, 498 F.2d 520, 524 (9th Cir. 1974) (cargo flight from Los Angeles to Viet Nam), cert. denied, 419 U.S. 1070 (1974); *Hammill v. Olympic Airways, S.A.,* 1975 AMC 1959, 1966, 398 F. Supp. 829, 834 (D.D.C. 1975) (flight across Mediterranean Sea from Greek Island of Corfu to Athens).

reached the point of crisis above the high seas"). Here, as the evidence recently released by the NTSB confirms, events over navigable water set the accident in motion; a portion of the aircraft fell into San Francisco Bay; and at the point of impact, some of the passengers were still over water. Those circumstances easily satisfy the second element.

Finally, regarding the third element, the test is whether this type of incident has the *potential* to disrupt maritime commerce. That test has not been interpreted as presenting a high bar for jurisdiction. An airplane crash easily provides enough "potential" disruption to maritime commerce, especially compared to the modest "potential" disruption that satisfied the test in other cases. [4] Indeed, far from potential disruption, the actual disruption here was significant—the airport was shut down and other trans-oceanic flights delayed.

In ruling on the motions to remand in the eight earlier cases removed to this Court, Judge Leinenweber determined that the second requirement for federal maritime jurisdiction, whether the tort occurred on navigable water, was satisfied for an accident on land only if the accident became "inevitable" when the aircraft was over water. While Boeing disagrees with that interpretation of the standard, even if that were the legal test it is easily satisfied here. Plaintiffs essentially concede that the crash was inevitable as the airplane approached the seawall over water, alleging that "the aircraft began to fly too slowly and descended below the safe approach path, and the flight crew was unable to restore a safe airspeed before the airplane crashed into a seawall adjacent to the runway." Ex. A: Complaint ¶ 1.

Even without this concession, plaintiffs cannot seriously dispute that the crash was inevitable while the airplane was over the water. The pilots knew they were dangerously low, and they tried to abort the landing. Ex. C: Bolds-Moorehead Decl. ¶ 10. They used every means available to avoid impacting the water or ground, including pushing the throttles to full power

---

[4] *See Sisson v. Ruby,* 497 U.S. 358, 364-65 (1990) (fire on a pleasure boat docked at a marina); *Foremost Ins. Co. v. Richardson*, 457 U.S. 668, 675-76 (1982) (collision of pleasure boats on the Amite River in Louisiana); *see also In re Mission Bay Jet Sports, LLC*, 570 F.3d 1124, 1130 (9th Cir. 2009) (passenger thrown from jet-ski into San Diego's Mission Bay); *Tagliere v. Harrah's Illinois Corp.*, 445 F.3d 1012, 1015 (7th Cir. 2006) (patron falling from a stool while playing a slot machine on a docked riverboat casino).

LEGAL29229616.1

and pulling the control column all the way back in an attempt to arrest their descent. *Id.* ¶ 11. Their attempt was unsuccessful. Further, based on simulator analysis, the NTSB concluded that during the final 10 seconds, while still over water, the airplane did not have the performance capability to "go around." Ex. D: Campbell Decl., Attach. A at 2, 10. Information from the black boxes and from the NTSB Performance Group analysis—information Judge Leinenweber did not have available when he ruled—thus demonstrates that the accident became inevitable when the entire aircraft was still over San Francisco Bay. Admiralty jurisdiction is proper.

Admiralty cases can be removed under section 1441(a). Section 1441(a) permits removal when the case is one over "which the district courts of the United States have original jurisdiction." Here, this case could have been filed originally in this Court based upon admiralty jurisdiction. The existence of admiralty jurisdiction suffices to authorize removal. *See Ryan*, 945 F. Supp. 2d. at 777-78; *see also Bridges v. Phillips 66 Co.*, CIV.A. 13-477-JJB, 2013 WL 6092803 (M.D. La. Nov. 19, 2013); *Wells v. Abe's Boat Rentals Inc.*, CIV.A. H-13-1112, 2013 WL 3110322 (S.D. Tex. June 18, 2013).[5]

## II.     Federal officer removal is proper.

Federal jurisdiction under the federal officer removal statute, 28 U.S.C. § 1442(a)(1), also supplies a basis for removal here. Under that statute, removal is proper if Boeing is "a (1) 'person' (2) 'acting under' the United States, its agencies, or its officers (3) that has been sued 'for or relating to any act under color of such office,' and (4) has a colorable federal defense to the plaintiff's claim." *Ruppel v. CBS Corp.*, 701 F.3d 1176, 1180-81 (7th Cir. 2012) (citations omitted). Each of those elements is met here.

Boeing is a "person" under section 1442(a). *See Ruppel,* at 1181. Boeing employees serving as designated representatives of the FAA for certification purposes are acting under the

---

[5] There are older cases holding that admiralty cases may only be removed if there is a basis for federal jurisdiction other than admiralty jurisdiction, such as federal question or diversity jurisdiction. Those holdings were the product of the old version of section 1441(b) and the Supreme Court's interpretation of federal question jurisdiction. Those cases have been superseded by the 2011 amendment to section 1441(b), as explained in *Ryan*, 945 F. Supp. 2d at 777-78. Under the plain language of sections 1441(a) and (b), this case is removable.

authority of a federal agency. *See Magnin v. Teledyne Cont'l Motors*, 91 F.3d 1424, 1428 (11th Cir. 1996) (holding that FAA delegated representative was acting under federal authority); *see also Scrogin*, 2010 WL 3547706, at *4 (same); *AIG Europe*, 2003 WL 257702, at *4 (same).[6] And Boeing itself is an FAA delegated representative. From 2004 to 2009, the FAA expressly delegated to Boeing certain types of authority relating to certification of aircraft through the Delegation Option Authorization program. Ex. F: Supp. Bowen Decl. ¶ 4. Here, Boeing and its designated employees serve as FAA representatives and supervise and approve testing and analysis—on behalf of the FAA—that establishes regulatory compliance and ultimately leads to an aircraft's type certification, production certification, and airworthiness certification. *See S.A. Empresa*, 467 U.S. at 806. The complaint broadly alleges that the aircraft was "defective, not airworthy and/or not crash-worthy as a result of Boeing defective design, manufacture, distribution, testing, maintenance, service and/or inspection of the subject aircraft." Ex A: Complaint ¶ 100.

Delegated representatives of the FAA supervised and approved of hundreds of tests and analyses regarding the 777. The results of those tests—and the conclusions by the delegated representatives that those tests and analyses were acceptable—led to a regulatory conclusion that the aircraft was airworthy. For just one example, as explained above, the Airplane Information Management System ("AIMS"), which includes the autothrottle function, is one of the numerous airplane systems Boeing employees with delegated authority review for compliance with Federal Aviation Regulations. The employees performed a safety analysis of AIMS, which showed that the system complied with the certification safety requirements in the Federal Aviation Regulations. Ex. E: Bowen Decl. ¶ 8. Only when the safety analysis was complete did the

---

[6] In the litigation leading up to the Supreme Court's most recent decision examining federal officer removal, the United States in its brief and in its argument took the position that FAA-delegated representatives act under federal authority for purposes of section 1442. *See* Brief of the United States, *Watson v. Philip Morris Cos.*, 2007 WL 621847, p. 26 (2007); Oral Arg. Tr. at 21-22, available at http://www.supremecourt.gov/oral_arguments/argument_transcripts/05-1284.pdf. The United States pointed out that the FAA's delegated representatives exercise the kind of formal, supervised regulatory authority that Philip Morris did not possess in Watson, and the Supreme Court emphasized precisely that missing element in its decision holding that federal officer removal was improper there. *See Watson v. Philip Morris Cos.*, 551 U.S. 142, 156 (2007) ("[W]e have found no evidence of any delegation of legal authority from the FTC to the industry association to undertake testing on the Government agency's behalf.").

Boeing employees recommend pursuant to their delegated authority that the FAA approve the safety analysis and find that the AIMS, including the autothrottle, complies with the Federal Aviation Regulations and is airworthy. The FAA approved the safety analysis and made the finding as recommended. *Id.* ¶ 10. When plaintiffs allege the autothrottle was defective, they are directly challenging the conclusion of the Boeing employees who served as the FAA's delegated representatives. That is true for numerous systems and components, not just AIMS.

In remanding eight earlier cases, Judge Leinenweber determined that the court lacked federal officer jurisdiction based on the misapprehension that the plaintiffs in those cases did not assert negligence or other defect in the certification process. That is incorrect in the earlier cases, and is incorrect here. Boeing has sought reconsideration of the remand order to correct this misapprehension of law and fact.

Finally, Boeing must show that it has at least a "colorable" federal defense. *See Ruppel*, 701 F.3d at 1182. Boeing's federal defense is far better than colorable. Boeing's defense is that it complied with federal law and cannot be held liable under state or maritime law without a showing that it violated federal regulatory standards. The FAA and its regulations occupy the field. To the extent state law would require a different result, it is preempted. The Seventh Circuit (and others) have recognized that federal law preempts state law in the broad field of aviation safety. *See Bieneman v. City of Chicago*, 864 F.2d 463, 473 (7th Cir. 1988) ("Bieneman's complaint suggests that damages should be awarded because there are too many flights per hour, or because the aircraft are older models not fitted with high-bypass turbofan engines, or because the planes do not climb at a sufficiently steep rate after takeoff. These subjects are governed by federal law, and a state may not use common law procedures to question federal decisions or extract money from those who abide by them.").

Other courts presented with federal officer removal when the conduct and conclusions of FAA delegated representatives are at issue have recognized that federal preemption based upon the FAA's regulatory authority is colorable. *See Magnin*, 91 F.3d at 1428 ("At least part of Smith's defense is that he acted within the scope of his federal duties, that what he did was

required of him by federal law, and that he did all federal law required. That defense raises a federal question, which justifies removal."); *AIG Europe*, 2003 WL 257702, at *4 (C.D. Cal. Jan. 28, 2003) (finding as a colorable federal defense that the aircraft "was certified as airworthy by the FAA and complied with all applicable codes, standards, and regulations").

For those reasons, federal officer removal is also a proper basis for removal here.

## CONCLUSION

Based upon the foregoing, this case is properly removed to federal court. Ultimately, this case should be transferred to the Northern District of California to be consolidated with the other lawsuits arising from this accident.

Dated: February 6, 2014                                             Respectfully submitted,

                                                                    THE BOEING COMPANY

                                                                    By: /s/  Bates McIntyre Larson
                                                                          One of Its Attorneys

Bates McIntyre Larson, ARDC No. 6272698
BLarson@perkinscoie.com
**PERKINS COIE LLP**
131 South Dearborn Street, Suite No. 1700
Chicago, Illinois 60603-5559
Tel: (312) 324-8400
Fax: (312) 324-9400

Michael E. Scoville, Washington Bar No. 44913
MScoville@perkinscoie.com
**PERKINS COIE LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Tel: (206) 359-8000
Fax: (206) 359-9000

*And Of Counsel*

John D. Dillow, California Bar No. 50403
JDillow@perkinscoie.com
Bruce D. Campbell, Washington Bar No. 8629
BCampbell@perkinscoie.com
Joe Silvernale, Washington Bar No. 22001

JSilvernale@perkinscoie.com
Eric B. Wolff, Washington Bar No. 43047
EWolff@perkinscoie.com
Christopher M. Ledford, Washington Bar No. 44515
CLedford@perkinscoie.com
**PERKINS COIE LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Tel: (206) 359-8000
Fax: (206) 359-9000

*Attorneys for Defendant*
*The Boeing Company*

## CERTIFICATE OF SERVICE

I, Bates McIntyre Larson, certify that on February 6, 2014, I electronically filed the foregoing *NOTICE OF REMOVAL* with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to attorneys of record. In addition, I caused service to be made on the following attorneys and parties by the method indicated:

| | |
|---|---|
| Monica E. Kelly, Esq. | ___ Via hand delivery |
| RIBBECK LAW CHARTERED | ___ Via U.S. Mail, 1st Class |
| 505 North Lake Shore Drive | _X_ Via Overnight Delivery |
| Suite 102 | ___ Via Facsimile |
| Chicago, Illinois 60611 | ___ Via Email |
| | ___ Other: _____ |

I certify under penalty of perjury that the foregoing is true and correct.

DATED this _6th__ day of February, 2014.

                              /s/     Bates McIntyre Larson
                              PERKINS COIE LLP
                              131 South Dearborn Street, Suite No. 1700
                              Chicago, Illinois 60603-5559
                              Tel: (312) 324-8400
                              Fax: (312) 324-9400